IN THE UNITED STATES DISRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

    v.             Criminal No. 3:18cr154 (DJN)

BRANDON ANDREA POWELL,
    Defendant.

## MEMORANDUM OPINION

  This matter comes before the Court on Defendant's Motion for Judgment of Acquittal (ECF No. 124), in which Defendant challenges his four convictions for making a False Statement in Connection with the Acquisition of a Firearm in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2). Defendant's Motion principally challenges the sufficiency of the evidence by alleging that his confession lacked sufficient corroboration as required by the Fourth Circuit's decision in *United States v. Rodriguez-Soriano*, 931 F.3d 281 (4th Cir. 2019). Defendant also asserts that ATF Form 4473 is fundamentally ambiguous. And during the briefing on this motion, an additional issue arose about the sufficiency of the evidence for Defendant's conviction on Count Five. For the reasons that follow, as well as those cited during oral argument on June 12, 2020, the Court hereby GRANTS Defendant's Motion.

## I. Factual Background

  Defendant appears before the Court as a highly decorated Iraq war veteran, having served two tours of duty. His first tour of duty was particularly perilous, as he served as a combat engineer responsible for clearing roadside bombs for main supply routes. (Tr.[1] 249:4-17.)

---

[1] Citations to "Tr." will refer to the transcript of the trial (ECF Nos. 119-21) unless otherwise denoted.

During this tour, Defendant participated in roughly 200 combat missions. (Tr. 250:20-22.) The Government's mental health expert, Dr. Evan Nelson, described Defendant's military service during his first tour of duty as "very harrowing, involving literally clearing bombs." (Tr. 337:9-10.) Defendant's second deployment to Iraq from 2008-2009 presented less danger, as it did not involve combat. (Tr. 255:18-256:22.)

Sadly, Defendant's heroic military service resulted in Post-Traumatic Stress Syndrome ("PTSD"), as described by experts for both the defense (Dr. Michael Lynch) and the Government (Dr. Evan Nelson). (Tr. 247-59, 336-37, 369-70.) Indeed, the United States Government — the very same government that prosecutes him — discharged him with a fifty percent disability due to the PTSD with an additional twenty percent disability for orthopedic injuries related to his service. (Tr. 258:15-16.) As a result of the PTSD, Defendant suffers from a pervasive depression disorder, which causes him to be chronically unhappy and which interfered with his marriage and social functioning. (Tr. 247:22-24, 259:2-22, 337:23-338:24). Defendant self-medicated with alcohol. (Tr. 258:23-259:1, 275:5-23.)[2]

Both experts also found Defendant to be intellectually deficient and possessing a low IQ. (Tr. 266:22-23, 365:25-366:13.) Indeed, Dr. Nelson bluntly described Defendant as "not a rocket scientist." (Tr. 366:13.) Dr. Lynch also believed that Defendant had "his toes in the water" as to the autism spectrum, but Dr. Nelson testified that he lacked sufficient information from Defendant's family to determine whether Defendant was autistic. (Tr. 270:18-19, 345:12-346:10.) Regardless of the existence of autism, Defendant possesses a visual processing

---

[2]     Defendant's Presentence Report reveals that Defendant was convicted after his military discharge of the misdemeanor offense of Driving While Under the Influence of Alcohol (DWI) in 2013, as well as three convictions for driving thereafter while his license was suspended. (ECF No. 23 at 11-12.) Defendant also had a previous misdemeanor conviction for DWI in 2000, but this was before his military service. (ECF No. 23 at 10.)

disorder.  (Tr. 267:20.)[3]  And Defendant's PTSD exacerbated his pre-existing developmental

disorders.  (Tr. 279:14.)  In short, by the time of the firearms purchases at issue, Defendant

suffered from significant mental health issues that can be traced to his exceptional military

service.

Following his discharge from active duty, Defendant continued to serve in the National

Guard as a staff sergeant (Tr. 310:19), while also working as an aide for a nonverbal, autistic

child.  (Tr. 263:24-25.)  As a staff sergeant, Defendant served as a squad leader.  (Tr. 310:22.)

His superior officer, Captain Matthew Henry, chronicled Defendant's many awards (seventeen

national awards and three state awards) and described Defendant as being "highly decorated

amongst his peers."  (Tr. 313-18.)

The charges at issue arise from Defendant's purchase of six firearms from three different

federally licensed firearms dealers on four different occasions.  The Government argued that

Defendant conspired with Trenton "Kirk" Pointer to purchase the firearms by serving as a straw

purchaser for Pointer and then lying on the ATF Form 4473 for each of the sales by identifying

himself as the actual buyer, when instead the firearms were for Pointer.  (Tr. 412-13.)  A review

of the evidence presented reveals that the only evidence supporting the Government's theory

came from Defendant's recorded statement to ATF agents roughly eighteen months after the

purchases.  Defense counsel countered with an argument that any inaccuracies on the forms

resulted from innocent mistakes by Defendant.  (Tr. 421.)

The Government began its case with the testimony of representatives from the three

firearms dealers.  Christopher Presnell first testified that he worked as a sales associate for Town

---

[3]        Dr. Lynch believed that Defendant also suffered from a Schizoid Personality Disorder
(Tr. 248:2-14, 260:23-261:20); however, Dr. Nelson disagreed on this point.  (Tr. 341:22-23.)

Police Supply Company in Richmond, Virginia. (Tr. 125:15-126:2.) This location operates

roughly a mile from Defendant's residence. (Tr. 209:17.) Presnell testified about Defendant's

purchase of a Taurus 9 mm pistol, model PT111G2, on August 19, 2015. (Tr. 129:14, 135:10-

11.) Although Presnell had no independent recollection of the sale (Tr. 139:11), he was able to

testify about the transaction from the forms related to the sale. (Gov't Ex. 1A-C.)

> The relevant question for ATF Form 4473 provides in Question 11a:

> Are you the actual transferee/buyer of the firearm(s) listed on this form? Warning: you are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearms to you. (See Instructions for Question 11a.) Exception: If you are picking up a repaired firearm(s) for another person, you are not required to answer 11a and may proceed to question 11b.

(Gov't Ex. 1A at 1.) The instructions for Question 11a further explain:

> **Question 11a. Actual Transferee/Buyer:** For purposes of this form, you are the actual transferee/buyer if you are purchasing the firearm for yourself (*e.g., redeeming the firearm from pawn/retrieving it from consignment, firearm raffle winner*). You are also the actual transferee/buyer if you are legitimately purchasing the firearm as a gift for a third party. **ACTUAL TRANSFEREE/BUYER EXAMPLES:** Mr. Smith asks Mr. Jones to purchase a firearm for Mr. Smith. Mr. Smith gives Mr. Jones the money for the firearm. Mr. Jones is **NOT THE ACTUAL TRANSFEREE/BUYER** of the firearm and must answer "NO" to question 11a. The licensee may not transfer the firearm to Mr. Jones. However, if Mr. Brown goes to buy a firearm with his own money to give to Mr. Black as a present, Mr. Brown is the actual transferee/buyer of the firearm and should answer "YES" to question 11a. However, you may not transfer a firearm to any person you know or have reasonable care to believe is prohibited under 18 U.S.C. § 922(g), (n), or (x). **Please note: EXCEPTION:** If you are picking up a repaired firearm(s) for another person, you are not required to answer 11a and may proceed to question 11b.

(Gov't Ex. 1A at 4.) (bold, italics and capitalization in original). Defendant checked the box for

Yes, thereby indicating that he was the actual buyer of the firearm and that he was not

purchasing the firearm as a gift. (Gov't Ex. 1A at 1.) Presnell sold the firearm to Defendant

after a NICS background check approved Defendant as a buyer. (Tr. 130:15-131:17.) Presnell

acknowledged that had Defendant purchased the firearm as a gift for a third party, he would

constitute an actual buyer under the terms of the form. (Tr. 145:3.)

Presnell also indicated that Defendant made an error when completing ATF Form 4473 by checking NO for Question 12, thereby indicating that he was an alien. (Gov't Ex. 1A at 1; Tr. 146:13-19.) Presnell knew that Defendant was a citizen, because he showed Presnell his voter's identification card. (Gov't Ex. 1B; Tr. 147:5-14.) Therefore, Presnell directed Defendant to correct the form, which Defendant then initialed. (Tr. 146:24-147:4.)

Presnell also testified that another form introduced as Government's Exhibit 1B asked if Defendant had purchased a firearm from the store within the last five days. (Gov't Ex. 1B.) Defendant answered that he had not after being asked by Presnell. (Tr. 134:4-8.) The receipt for the sale (Gov't Ex. 1C) cited a sales price of $199 with a $2 fee for the background check. (Tr. 135:16-17.) When asked if Town Police Supply offered a military discount, Presnell stated that: "We do for certain manufacturers of firearms, yes, sir." (Tr. 135:20-21.) Presnell could not recall for certain if the military discount was offered for Taurus firearms at the time of the purchase. (Tr. 137:9-14.) He did testify, however, that it was possible that a military discount was given to Defendant via a manager's override. (Tr. 138:1-5.)

The Government next called Justin Pennington as a witness. Pennington works at the Bob Moates Sport Shop in Midlothian, Virginia. (Tr. 150:2.) This store operates roughly a half mile from Defendant's residence. (Tr. 209:20-21.) Although he had no independent recollection of the sale (Tr. 156:10), Pennington sold two Taurus 9 mm firearms, both model number PT111G2, to Defendant on August 21, 2015 — two days after Defendant had made the purchase from Town Police Supply Company. (Gov't Ex. 2A; Tr. 150-52.) Again, Defendant indicated that he was the actual purchaser of the firearm in Question 11a. (Gov't Ex. 2A at 1; Tr. 152:14-15.) Pennington sold the firearm to Defendant after the NICS background reported that Defendant was approved for the purchase. (Tr. 154:1-6.) And as with the first purchase,

Defendant again wrongly answered Question 12 about being an alien and he had to correct his answer. (Gov't Ex. 2A at 1; Tr. 159-60.) Pennington also testified that Bob Moates Sport Shop offers a military discount, but no discount was indicated on the receipt. (Tr. 156:1-7.)

David Hancock, a co-manager at Bob Moates Sport Shop, followed Pennington as a witness. (Tr. 163:9-11.) Hancock testified, rather incredulously considering the number of firearms sales that he had participated in since 2015, that he remembered this specific transaction, because Defendant had an unusual middle name. (Tr. 164:12.) The Government later disavowed Hancock's testimony when cross-examination revealed that Hancock had posted several racially offensive comments on his Facebook page, about which the Government did not know. (Tr. 179-91, 417:1-12.) Hancock completed an ATF Form 4473 for Defendant's purchase of two Taurus firearms that were different models on September 8, 2015. (Gov't Ex. 2C; Tr. 164.) Defendant answered Question 11a that he was the actual buyer of the firearms. (Gov't Ex. 2C at 1.) The receipt for the sale (Gov't Ex. 2D) reflected a sale price of $289.99 for each firearm. (Tr. 169:11-13.) Hancock stated that Bob Moates offered a military discount; however, it did not appear that this sale involved a discount. (Tr. 169:16-21.) Reviewing the receipt for the sale conducted by Justin Pennington on August 21, 2015 (Gov't Ex. 2B), Hancock testified that a military discount of $30 could have been applied to the sale of the firearms on that date. (Tr. 170:15-20, 176:16-177:7.)

Michael Madigan, a former employee of Green Tops Sporting Goods, next testified about Defendant's purchase of a Taurus 9 mm firearm, model millennium G2, on September 13, 2015. (Tr. 193-97.) Green Tops Sporting Goods store operates in Ashland, Virginia, which is roughly a 30-minute drive from Defendant's residence. (Tr. 210:4.) Madigan also lacked memory of the sale, so he testified based on the ATF Form 4473 for the sale. (Gov't Ex. 3A; Tr. 195:24-196:1.)

The form reflected that Defendant answered Question 11a that he was the actual buyer of the firearm. (Gov't Ex. 3A at 1; Tr. 197:19-23.) The sales receipt for the transaction (Gov't Ex. 3B) sets forth a price of $265.99 and stated that Defendant had saved $14. (Tr. 198:23, 199:14.) The discount of $14 was likely a military discount. (Gov't Ex. 3B; Tr. 198:24-200:8.)

The existence of a military discount constituted a consequential fact, because the Government told the jury in its opening statement that "records from Bob Moates and Town Police are going to show . . . that he didn't receive any [military] discount." (Tr. 115:8-10.) That appears not to be accurate. The Government argued this point, because Defendant had told investigators that his friends asked him to purchase the firearms to utilize his military discount, as detailed below. (Gov't Ex. 5B ("Statement Tr.") 16:23-25.) Moreover, the Government repeatedly states in its filings that Defendant had no good reason to drive thirty minutes to Ashland to purchase a firearm, when its evidence demonstrates that Defendant received a financial incentive for doing so.

The Government then introduced two stipulations. First, the parties agreed that the three stores at issue were federally licensed firearms dealers. (Stipulation 1 (ECF No. 97); Tr. 203.) Next, the parties stipulated that the firearms at issue "were recovered by law enforcement officers from another person unrelated to the defendant in another state" as follows:

| Recovery Date | Firearms |
|---|---|
| August 24, 2015 | 2 Taurus PT111 G2 9mm handguns, serial numbers TIS82795 and TIS84209 |
| September 10, 2015 | Taurus PT709 Slim 9mm handgun, serial number THX64643 and Taurus PT111 G2 9mm handgun, serial number TIO79478 |
| February 10, 2016 | Taurus PT111 G2 9mm handgun, serial number TIT24127 |

(Stipulation No. 2 (ECF No. 97); Tr. 203-04.)[4]  In other words, the firearm that Defendant purchased on August 19, 2015, from the Town Police Supply was recovered roughly three weeks later on September 10, 2015.  The two firearms that Defendant purchased on August 21, 2015 from the Bob Moates Sport Shop were recovered three days later on August 24, 2015.  Of the two firearms purchased on September 8, 2015 from the Bob Moates Sport Shop, one was recovered two days later on September 10, 2015.  Finally, the firearm purchased from the Green Top Sporting Goods Store on September 13, 2015, was recovered roughly five months later on February 10, 2016.

The Government concluded its case with the testimony of its case agent, ATF Special Agent Joseph Norman.  He and his colleague, ATF Special Agent Michael Liptak, interviewed Defendant at his residence on March 21, 2017 — roughly eighteen months after the purchases at issue.  (Tr. 208-10.)  Importantly, nearly the entirety of the interview was recorded, as the agents spoke to Defendant only for roughly 20 seconds before the agents began the recording to which Defendant consented.  (Tr. 211:7-23, 218:6-16.)  The Government introduced the recording (Gov't Ex. 5A) with an accompanying transcript (Gov't Ex. 5B), both of which were redacted as a result of the Court's ruling on Defendant's Motion in Limine (ECF No. 76).  Notably, the agents forgot to question Defendant about the purchase from the Green Top Sporting Goods Store on September 13, 2015 (the purchase at issue in Count Five), because they did not have the ATF Form 4473 for that purchase with them and Defendant did not bring it up.  (Tr. 218:17-

---

[4]        The parties entered into this stipulation after the Court granted Defendant's Motion in Limine (ECF No. 76), precluding the Government from introducing evidence regarding undercover purchases of the firearms in New York of which Defendant had no knowledge.  (Feb. 14, 2020 Hr'g Tr. 3-8.)  The Court further discusses this motion below, because the Government repeatedly references this ruling while addressing the *Rodriguez-Soriano* challenge.

219:3.) Consequently, all questions about the purchases centered on the purchases from the Town Police Supply and the Bob Moates Sport Shop. (Gov't Ex. 5B.)

The recording reveals a non-coercive interview with Agent Liptak raising his voice only slightly at one point, telling Defendant to stop lying. (Tr. 219:10-16.) During the interview, Defendant initially lied when asked about the location of the firearms that he purchased, saying that he still possessed them, kept them in a safe, had last seen them in June and that he gave them to a friend to hold while he was at annual training. (Statement Tr. 4-7.)

After initially lying, Defendant then acknowledged that he bought the firearms and gave them to his friend "Kirk" (Trenton Kirk Pointer) and his girlfriend Monica (French). (Statement Tr. 9:3-5.) Defendant gave the firearms to them, because they needed them. (Statement Tr. 9:15.) He said that Pointer and French approached him and asked him to make the firearms purchases, because they wanted to utilize his military discount. (Statement Tr. 23:13-19.) Defendant also said that he was the only one that could get a military discount, so that's why he purchased them. (Statement Tr. 16:23-25.) He believed that the military discount was ten percent. (Statement Tr. 17:2.)

Defendant also indicated that he and Monica went together to purchase the firearms. (Statement Tr. 10:3-7.) Defendant stated that Pointer provided the money for the purchases and he (Defendant) kept the change ($70 or $80) from the money used for the purchases. (Statement Tr. 12-15.) Defendant said that he made the purchases, because he needed the cash. (Statement Tr. 21:3.) Defendant had no idea what Pointer and French did with the firearms after he turned over the firearms to them. (Statement Tr. 10:19, 15:17.) However, they told Defendant that they wanted to give the firearms as Christmas gifts. (Statement Tr. 29:11-14.)

When asked if he knew whether Pointer was a convicted felon, Defendant responded: "Not that I know of." (Statement Tr. 20:20-23.) The Government offered no evidence to the contrary. Defendant later told Dr. Evan Nelson, the Government's mental health expert, that he did not know that the firearms purchases were illegal and that Pointer and French had pressured him to make the purchases. (Tr. 364:2-24.) When asked about why Defendant admitted to what occurred with the purchases after initially lying, Dr. Nelson stated: "This is a man of good character who realized he was in trouble and was trying to do the right thing both for self-protective issues and because he was concerned about how he would be perceived." (Tr. 360:9-12.)

At some point after the interview, Special Agent Norman sent photos via text message to Defendant that Defendant identified as Pointer and Monica (French). (Tr. 220:13-221:25.) Special Agent Norman testified that he did not know that Defendant had served in Iraq or that he suffered from PTSD. (Tr. 222:19-25.)

After Special Agent Norman testified, the Government rested its case. Defense counsel made a motion for acquittal under Fed. R. 29, asking the Court to overrule the Supreme Court's decision in *Abramski v. United States*, 573 U.S. 169 (2014), which the Court declined for obvious reasons. (Tr. 233:3-17.) Defense counsel also raised the corroboration rule as to Defendant's confession, which the Court rejected subject to further briefing if the jury were to convict Defendant. (Tr. 233:19-234:22.)

The defense case consisted of the testimony of Dr. Michael Lynch about Defendant's mental health issues, which is summarized above, a character witness (Wilbert Jones) and the testimony of Defendant's superior officer in the National Guard, Captain Michael Henry, also discussed above. (Lynch testimony, Tr. 240-301; Jones testimony, Tr. 302-08; Henry testimony,

Tr. 308-19.) At the conclusion of the defense case, defense counsel again raised the Rule 29 motion, which the Court denied. (Tr. 325:15-17.) In rebuttal, the Government offered the testimony of its mental health expert, Dr. Evan Nelson, which has also been previously summarized. (Tr. 332-73.) At the conclusion of the Government's rebuttal evidence, defense counsel raised the Rule 29 motion for the third time, which the Court again denied. (Tr. 374:11-375:24.)

## II.    Procedural History

This case began on December 18, 2018, when a grand jury indicted Defendant on five counts pertaining to the purchase of the six firearms. (the "Indictment") (ECF No. 2).) Count One charged Defendant with participating in a Conspiracy to Make False Statements in Connection with the Acquisition of Firearms in violation of 18 U.S.C. § 371. The jury ultimately acquitted Defendant on this count. (ECF No. 117.) The four other charges alleged that Defendant made a False Statement in Connection with the Acquisition of a Firearm in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2). Specifically, the Indictment alleged that Defendant made false statements in the ATF Form 4473 in connection with the following purchases:

| Count | Date of Purchase | Firearm(s) Purchased | Licensed Firearms Dealer |
|---|---|---|---|
| 2 | 8/19/2015 | Taurus 9 mm handgun Model PT111G2 bearing serial number 7IO79478 | Town Police Supply of Richmond |
| 3 | 8/21/2015 | Two Taurus 9 mm handguns Model PT111G2 bearing serial numbers TIS84209 and TIS82795 | Bob Moates Sport Shop |
| 4 | 9/8/2015 | Taurus 9 mm handgun Model PT111G2 bearing serial number TIT18066 and Taurus 9 mm handgun Model PT709 bearing serial number THX64643 | Bob Moates Sport Shop |
| 5 | 9/13/2015 | Taurus 9 mm handgun Model Millennium G2 bearing serial number TIT24127 | Green Top Sporting Goods |

The case was initially assigned to United States District Judge M. Hannah Lauck. On February 21, 2019, Defendant entered a guilty plea to Count Five of the Indictment as part of an agreement that provided that the Government would dismiss the other charges. (ECF Nos. 14-15.) In preparation for sentencing, defense counsel had Defendant submit to a mental health examination by Dr. Lynch, which ultimately led to defense counsel filing a document entitled "Defendant's Memorandum on Withdrawal of Plea." (ECF No. 36.) Based on the assertions in Defendant's Memorandum, Judge Lauck permitted Defendant to withdraw his plea of guilty and reassigned the case to the undersigned, essentially allowing the case to start over in light of the mental health issues diagnosed by Dr. Lynch. (ECF No. 42.)

By the time of reassignment, a Presentence Report had been completed for Defendant. (ECF No. 23.) Consequently, following reassignment, the undersigned reviewed all of the filings in the case, including the Presentence Report. Defendant first appeared before the undersigned on November 18, 2019. (ECF No. 49.) At that time, Defendant elected to withdraw his guilty plea after being colloquied. (Nov. 18, 2019 Hr'g Tr. (ECF No. 53) 2:12-5:20.) During the hearing, the Court asked the Government to consider Defendant for Pretrial Diversion based on his exceptional military record, his mental health issues arising from his military service, his minimal criminal record and the unique aspects of the case. (Nov. 18, 2019 Hr'g Tr. 13-15.) In making the request, however, the Court made clear that the authority to place someone in Pretrial Diversion rested with the Executive Branch and the Government's decision was not subject to review by the Court. (Nov. 18, 2019 Hr'g Tr. 14:14-16.) The Court scheduled the matter for a status hearing to determine the Government's position on Pretrial Diversion for December 5, 2019, but in the interim set the case for trial. (Nov. 18, 2019 Hr'g Tr. 11-13.)

The Government rejected placing Defendant in Pretrial Diversion. (ECF No. 52.) The Government reiterated its position during the status hearing on December 5, 2019. (Dec. 5, 2019 Hr'g Tr. (ECF No. 126) 2:13.) The Court indicated that it disagreed with the Government's position, but its decision was not subject to the Court's review. (Dec. 5, 2019 Hr'g Tr. 2:14-16.) The Court then asked defense counsel if Defendant preferred a bench or jury trial. (Dec. 5, 2019 Hr'g Tr. 2:17-19.) Defense counsel responded that Defendant intended to waive his jury trial rights, but the Government demanded a jury trial. (Dec. 5, 2019 Hr'g Tr. 2:20-23.) The case then proceeded forward as scheduled for a jury trial.

The Court conducted a hearing on January 15, 2020, to address the handling of the mental health evidence that Defendant intended to introduce. Defense counsel indicated that the defense did not intend to pursue an insanity defense, but did intend to introduce mental health evidence to challenge the voluntariness of Defendant's statements to law enforcement. (Jan. 15, 2020 Hr'g Tr. 3-11.) The Government agreed that Defendant had the right to introduce the mental health evidence for this limited purpose. (Jan. 15, 2020 Hr'g Tr. 6:10-16.) Importantly, Defendant never sought to suppress his statement based on any constitutional violation.

The Court held a Final Pretrial Conference for this case on February 14, 2020. At that time, the Court granted Defendant's Motion in Limine (ECF No. 76) during the hearing and in subsequent orders. (ECF Nos. 98, 105.) Because the Government repeatedly complains about the Court's ruling on this motion during briefing on the Motion for Judgment of Acquittal, the Court adds additional comments here about its previous ruling.

Defendant's motion sought to preclude the Government from introducing evidence of undercover purchases of five of the firearms at issue from Abdul Davis in New York. (ECF No. 76.) Essentially, the Government's theory was that, after Defendant purchased the firearms for

Pointer, Pointer then provided them to Davis, who sold them to the undercover agents. (Government's Response to Defendant's Motion in Limine to Prohibit Testimony on Purchases of Firearms by Undercover Police Officer (ECF No. 87) at 1.)[5] However, the Government acknowledged that it had no evidence that Defendant had any knowledge of the downstream sales of the firearms by Davis. (Feb. 14, 2020 Hr'g Tr. 3:16.) And the Government has since reconfirmed its lack of evidence regarding Defendant's knowledge of Davis's activities. (ECF No. 134 at 26.) For this reason, the Court granted the motion, finding that a separate conspiracy existed between Pointer and Davis for the downstream sales. (Feb. 14, 2020 Hr'g Tr. 3:21-23.)

The Government correctly points out in its papers that the existence of multiple conspiracies is a question for the jury. *United States v. Roberts*, 262 F.3d 286, 294 (4th Cir. 2001). However, the Government ignores that the Court has a responsibility under Fed. R. Evid. 403 to ensure that the probative value of evidence offered by the Government is not substantially outweighed by unfair prejudice to the defendant. *See Kotteakos v. United States*, 328 U.S. 750, 777 (1946) (vacating conviction involving multiple conspiracies due to "unwarranted imputation of guilt from others' conduct"); *Roberts*, 262 F.3d at 294 (reversal would be appropriate "if the proof of multiple conspiracies was likely to have confused the jury into imputing guilt to him as a member of one conspiracy because of the illegal activity of members of the other conspiracy"). Indeed, in *Bourjaily v. United States*, the Supreme Court made clear that trial courts have a responsibility under Fed. Rule. Evid. 104 to make a preliminary finding about the existence of a conspiracy by a preponderance of the evidence before admitting evidence pertaining to the

---

[5]     The Government represents that both Pointer and Davis were convicted felons and, therefore, were prohibited from buying firearms. (ECF No. 81 at 2.) However, the Government elected not to introduce Pointer's criminal history into evidence. (Feb. 14, 2020 Hr'g Tr. 8-9.) Moreover, the Government's evidence shows that Defendant did not know that Pointer was a convicted felon. (Statement Tr. 20:20-23.)

conspiracy, which in that case involved co-conspirator statements.  483 U.S. 171, 174-76 (1987).

Here, the Court did just that, finding that Pointer participated in a second conspiracy to traffic

firearms of which, by the Government's own admission, Defendant had no knowledge.

 Three additional points about the preclusion of the evidence about the undercover

purchases from Davis bear mentioning.  First, the Indictment charged Defendant in Count One

with participating in a Conspiracy to Make False Statements in Connection with the Acquisition

of Firearms in violation of 18 U.S.C. § 371, not a Conspiracy to Illegally Sell Firearms.  Second,

the jury found no conspiracy at all existed between Defendant and Pointer when it acquitted

Defendant of Count One.  (ECF No. 117.)  Third, the Court did permit the introduction of

Stipulation No. 2, which provided that five of the firearms at issue "were recovered by law

enforcement officers from another person unrelated to the defendant in another state" and then

set forth the dates that the firearms were recovered.  (Feb. 14, 2020 Hr'g Tr. 5-7; ECF No. 97;

Tr. 203-04.)  So, the Government was able to establish that Defendant no longer had possession

of the firearms shortly after they were purchased.

 The case then proceeded to trial, beginning with jury selection on February 21, 2020, and

concluding on February 26, 2020.  As noted, the jury ultimately acquitted Defendant on Count

One (the conspiracy offense), but convicted him of the four substantive counts pertaining to his

making of false statements in the ATF 4473 forms.  (ECF No. 117; Tr. 458-59.)  Defendant

repeatedly and timely raised motions for acquittal under Fed. R. Crim. 29 throughout the trial,

which the Court denied subject to later briefing.  (Tr. 232-34, 325, 374-75.)

 After the trial, Defendant filed his Motion for Judgment of Acquittal ("Def. Mot." (ECF

No. 124)) to which the Government responded ("Gov't Resp." (ECF No. 131)).  After reviewing

the Government's response, the Court directed the Government to supplement its response by

answering a series of questions (ECF No. 132), which the Government did (ECF No. 134). Because the Government did not properly respond to three of the questions, the Court ordered the Government to again supplement its response and to directly answer the Court's questions (ECF No. 135), which the Government did (ECF No. 137). Thereafter, Defendant filed his reply. ("Def. Reply." (ECF No. 139).) As a result of an argument raised by Defendant in its reply, the Court instructed the Government to file a sur-reply to address Defendant's argument regarding proof of exchange of money for the purchases. (ECF No. 140.) While reviewing the various filings and the transcript, the Court realized that Defendant's statements to law enforcement made no mention of the last purchase at the Green Top Sporting Goods and, therefore, instructed the Government to address the sufficiency of the evidence for Count Five in its sur-reply, while also affording Defendant an opportunity to respond. (ECF No. 141.) The Government filed its sur-reply (ECF No. 143) to which Defendant then responded. (ECF No. 144.) The Court heard argument on the motion on June 12, 2020, thereby rendering the motion ripe for decision.

### III. Analysis

#### A. Standard of Review

The Court reviews a Motion for Judgment of Acquittal under Rule 29 to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) (emphasis in original). As the Supreme Court further explained: "That limited review does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). And in

meeting its burden, "[t]he government may rely on circumstantial evidence and inferences, but it still must prove each element of an offense beyond a reasonable doubt." *Rodriguez-Soriano*, 931 F.3d at 286. The Court must also "assume that the jury resolved all contradictions in the testimony in favor of the government" and "where the evidence supports differing reasonable interpretations, the jury will decide which interpretation to accept." *United States v. Moye*, 454 F.3d 390, 394 (4th Cir. 2006) (*en banc*).

### B. Defendant's Challenge to ATF Form 4473

Defendant challenges ATF Form 4473 by arguing that the form is fundamentally ambiguous, citing to the Fourth Circuit's decision in *United States v. Sarwari*, 669 F.3d 401 (4th Cir. 2012). This argument can be easily disposed of as the form clearly surpasses the standard for ambiguity that *Sarwari* demands.[6]

In *Sarwari*, the Fourth Circuit set forth the following standard for assessing whether a form is ambiguous:

> The answer to a fundamentally ambiguous question may not, as a matter of law, form the basis for a false statement. But fundamental ambiguity is the exception, not the rule. A question is fundamentally ambiguous only when it is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony . . . . When a question is not fundamentally ambiguous, but merely susceptible to multiple interpretations, and a defendant's answer is true under one understanding of the question but false under another, the fact finder determines whether the defendant knew his statement was false.

669 F.3d at 407 (internal citations and quotations marks omitted).

---

[6]     It does not appear that Defendant raises an unconstitutionally vague argument with respect to the form's alleged ambiguity. However, to the extent that he does, the Court will avoid the constitutional question, as it can grant Defendant's motion on other grounds. *See Jiminez v. BP Oil, Inc.*, 853 F.2d 268, 270 (4th Cir. 1988) ("It is well established that a court should avoid deciding a constitutional question when it can dispose of a case on another basis.").

Here, Question 11a asks if the purchaser is the actual transferee/buyer of the firearm. It then immediately warns the purchaser that "you are not the actual buyer if you are acquiring the firearm(s) on behalf of another person." (Gov't Ex. 1A at 1.) The Court finds that the question consists of a "phrase with a meaning about which men of ordinary intellect could agree." Defendant admits that this portion of the form — the question that he challenges — "is not excessively complicated." (Def. Mot. at 8.) Individuals of ordinary intellect could agree that if a third party had given money to the purchaser to make the transaction in the store and then hand over the firearm to the third party, then the purchaser is not the actual buyer. Yet, Defendant claims that the examples render the question fundamentally ambiguous. However, the examples pinpoint the exact factual scenario at issue here:

> Mr. Smith asks Mr. Jones to purchase a firearm for Mr. Smith. Mr. Smith gives Mr. Jones the money for the firearm. Mr. Jones is **NOT THE ACTUAL TRANSFEREE/BUYER** of the firearm and must answer "NO" to question 11a.

*Id.* (emphasis in original). Here, the Government alleges that Pointer (Mr. Smith) asked Defendant (Mr. Jones) to purchase a firearm for him and that Pointer gave the money for the firearm to Defendant. Again, individuals of ordinary intellect would agree on the meaning. Therefore, the Court does not find the question fundamentally ambiguous. Because the question "is not fundamentally ambiguous, but merely susceptible to multiple interpretations," the jury assumed the role of determining whether Defendant knowingly made a false statement. It decided that he did, and the Court will not disrupt that determination.

Defendant attempts to interject a subjective element into the analysis by claiming that the Government must prove that the "defendant understood the question as did the government." (Def. Mot. at 9 (quoting *Sarwari*, 669 F.3d at 409).) But this conflates the two distinct analyses undertaken by the court in *Sarwari*. When a defendant like the one here claims that a question is fundamentally ambiguous, such that it could not provide the basis for a false statement

conviction, *Sarwari* instructs courts to conduct the above analysis. 669 F.3d at 407-09. If, on the other hand, "a defendant claims that his answer to an arguably ambiguous question is true," then the court will look into the defendant's understanding of the question. *Id.* at 409. Defendant applies the standard in the second analysis to his argument in the first. But the Court need only undertake the first analysis, because Defendant has not claimed that his answer was true. Instead, he has only claimed that the ambiguity made it difficult to determine the meaning of the question. Therefore, the Court need not address the sufficiency of the evidence that Defendant understood the question as did the Government. Accordingly, the Court rejects Defendant's challenge based on the fundamental ambiguity of ATF Form 4473.

### C. Defendant's Challenge to the Convictions Based on the Corroboration Rule

The thrust of Defendant's motion focuses on the corroboration rule initially addressed by the Supreme Court in *Opper v. United States*, 348 U.S. 84 (1954). The Court will first review *Opper* and its progeny, then focus on the expansion of the corroboration rule that the Fourth Circuit's decision in *Rodriguez-Soriano* presents, and then apply the majority decision in *Rodriguez-Soriano* to the current case. But before turning to the corroboration rule, the Court must first address the offense for which Defendant has been convicted.

1.      False Statement in Connection with the Acquisition of a Firearm

The jury convicted Defendant of four counts of making a False Statement in Connection with the Acquisition of a Firearm in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2). Section 922(a)(6) provides in relevant parts:

(a) It shall be unlawful —

> (6)  for any person in connection with the acquisition or attempted acquisition of a firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter.

Section 924(a)(2) imposes a punishment of a term of imprisonment not to exceed ten years with a maximum fine of $250,000.

To establish a violation of § 922(a)(6), the Government must prove the following elements beyond a reasonable doubt:

(1)    The defendant made a false or fictitious written statement.

(2)    The defendant knew the statement was false.

(3)    The statement was made in connection with the acquisition of a firearm from a licensed firearms dealer.

(4)    The statement was intended to or likely to deceive a licensed firearms dealer.

(5)    The false statement was material to the lawfulness of the sale or disposition of the firearm.

*United States v. Rahman*, 83 F.3d 89, 92-93 (4th Cir. 1996); *see also* Jury Instruction No. 35 (ECF No. 115 at 41).

Here, the parties stipulated that the firearms purchases were from federally licensed firearms dealers (Stipulation No. 1; Tr. 203), and there was no challenge to the materiality of the statements at issue. Consequently, the focus of this case, as is generally true in straw purchase cases, is whether Defendant made a false statement in ATF Form 4473 and, if so, whether he knew that his statement was false. *Rodriguez-Soriano*, 931 F.3d at 287 (stating that "it was the

government's burden to prove that [the defendant] falsely stated to the licensed firearms dealer that he was purchasing the firearms for himself with the knowledge that the statement was false").[7] The corroboration rule must be applied through this prism.

The alleged false statement at issue here involves Defendant indicating in Question 11a for each of the purchases that he was the actual buyer of the firearms. Thus, the Government bears the burden of establishing beyond a reasonable doubt that Defendant knew that he was not the actual buyer of the firearms at the time of the purchases. *Dixon v. United States*, 126 S. Ct. 2437, 2441 (2006). Because an "actual buyer" includes those purchases involving a gift, the Government necessarily bears the burden of proving that Defendant did not purchase the firearms as a gift. *United States v. Ortiz*, 318 F.3d 1030, 1038 (11th Cir. 2003) ("Thus, a straw transaction occurred here because Ortiz *at the time of completing Form 4473* had no intention of keeping the firearms or giving them as a gift and instead was buying the firearms for Rivera, an ineligible purchaser who then paid for and took delivery of the firearms.") (emphasis in original). Despite acknowledging that a gift purchaser constitutes an actual buyer, the Government initially took the position that whether Defendant purchased the firearms as a gift constitutes an affirmative defense. (ECF No. 134 at 24-25.) However, during the hearing on June 12, 2020, the Government confirmed that whether Defendant purchased the firearm as a gift constitutes part of the actual buyer test and not an affirmative defense. (June 12, 2020 Hr'g Tr. 32:24-33:1.) The Court believes that any alleged false statement by Defendant about being the actual buyer necessarily entails whether he purchased the firearms as a gift, because ATF Form 4473 defines an actual buyer to include purchasing the firearms as a gift. *See Abramski*, 573

---

[7]     Defendant told the Government's mental health expert, Dr. Nelson, that he did not know that the firearms purchases were illegal. (Tr. 364:1-4.) However, Defendant's ignorance of the law offers him no refuge from prosecution. *Rehaif*, 139 S. Ct. at 2198.

U.S. at 186 ("The individual who sends a straw to a gun store to buy a firearm *is* transacting with the dealer, in every way but the most formal; and that distinguishes such a person from one who buys a gun, or receives a gun as a gift, from a private party.")  And the Government's first witness testified as much.  (Tr. 145:1-18.)[8]

The Court also disagrees with Defendant's effort to add an additional element to the offense by requiring the Government to prove that the funds used to purchase the firearms came from some other person.  (Def. Mot. at 5; Def. Reply at 3-6.)  In *Ortiz*, the Eleventh Circuit specifically held that "there is no requirement that the ineligible purchaser must supply the money up front in order for a straw purchase to occur." 318 F.3d at 1037.  And the goal of preventing straw purchases supports this view, as the framework underlying the statute serves to ensure that purchasers are lawfully permitted to buy the firearm and then that the Government has the ability to track the firearm when investigating criminal activity. *Abramski*, 573 U.S. 178-81.  Consequently, it is the identity of the actual buyer that carries import, not the source of the funds used to make the purchase. *Id.* (for this violation, the focus is on the acquisition, not the purchase of the firearm).  However, even though the Government need not establish the source of the funds in a straw purchase, its proof — or lack thereof — on this point may offer evidentiary value when determining whether Defendant was indeed the actual buyer.

The *sine qua non* of this offense consists of the Defendant's knowledge — whether he knew at the time of the purchases that he was not the actual buyer under the terms set forth in ATF Form 4473. *See Rehaif v. United States*, 139 S. Ct. 2191, 2197 (2019) (use of the word

---

[8]    In contrast, the Court agrees with the Government's position that whether the firearms were stolen from Defendant's possession constitutes an affirmative defense for which Defendant bears the burden of proof. *See Dixon*, 126 S. Ct. at 2447-48 (defendant bears the burden of proving an affirmative defense by a preponderance of the evidence).

"knowingly" in firearms statute "helps advance the purpose of scienter, for it helps to separate wrongful from innocent acts"). So, the Court must determine whether sufficient corroboration exists to support Defendant's statement that he purchased the firearms for Pointer and French instead of buying them for himself or as a gift. And the need for corroboration here takes on an added dimension due to Defendant's well-established mental health issues. *See United States v. Kirk*, 528 F.3d 1102, 1112 (8th Cir. 2008) ( "[T]he quantity and type of independent evidence necessary to corroborate a confession depends upon the facts of each case . . . [and must] tend to produce confidence in the truth of the confession."); *United States v. Washington*, 69 F. Supp. 143, 146-47 (D. Md. 1946) ("The reason for the rule which requires corroboration of the defendant's confession by independent evidence of the *corpus delicti* is that otherwise some persons, due to emotion unbalance or other mental instability, may confess to the commission of a crime, which in fact has never occurred . . . . The amount of independent corroborating evidence must, therefore, vary with the particular case, having special regard to the seriousness of the crime charged and possible consequences to the defendant.").

2.     *Opper* and its progeny

Any analysis of the corroboration rule must begin with the Supreme Court's decision in *Opper v. United States*, 348 U.S. 84 (1954). Before *Opper*, the Courts of Appeal were divided on the nature of corroboration necessary for a confession. Some courts required substantial independent proof to establish the *corpus delicti*, while others focused on the trustworthiness of the statement. *Opper*, 348 U.S. at 92-94. The Court in *Opper* rejected the *corpus delicti* approach and chose the trustworthiness test instead:

> [W]e think the better rule to be that the corroborative evidence need not be sufficient, independent of the statements, to establish the *corpus delicti*. It is necessary, therefore, to require the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement. Thus, the independent evidence serves a dual function. It tends to make the admission reliable, thus corroborating it while also establishing independently the other necessary elements of the office. It is sufficient if the corroboration supports essential facts admitted sufficiently to justify a jury inference of their truth. Those facts plus the other evidence besides the admission must, of course, be sufficient to find guilt beyond a reasonable doubt.

*Id.* at 93.

In *Smith v. United States*, 348 U.S. 147 (1954), a companion case issued the same day as *Opper*, the Court elaborated: "All elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused." *Smith*, 348 U.S. at 156. The Court continued its focus on the trustworthiness of the defendant's statement in *Wong Sun v. United States*, 371 U.S. 471 (1963), and noted, as here, that the defendant "has never suggested any impropriety in the interrogation itself which would require the exclusion of this statement." *Id.* at 491; *see also Opper*, 348 U.S. at 89 ("extrinsic evidence [is] sufficient which 'merely fortifies the truth of the confession, without independently establishing the crime charged.'") (quoting *Smith*, 371 U.S. at 156).

Until *Rodriguez-Soriano*, the Fourth Circuit faithfully followed *Opper* and its progeny by focusing on whether sufficient corroboration existed for the defendant's confession. In *United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008), the Court upheld the convictions of a member of *al Qaeda* for various terrorism offenses based on the reliability of the defendant's admissions. In doing so, the Fourth Circuit retraced the history of the corroboration rule and reminded that the Supreme Court in *Opper* had "rejected the *corpus delicti* rule and adopt[ed] the trustworthiness approach, which it found to be the 'better rule.'" *Abu Ali*, 528 F.3d at 235 (quoting *Opper*, 348

U.S. at 93).  The Court further explained that the "corroborative evidence need not be sufficient, independent of [defendant's] incriminatory statements, to establish the *corpus delicti*." *Abu Ali*, 528 F.3d at 235 (quoting *Opper*, 348 U.S. at 93).  Instead, "[i]ndependent evidence adequately corroborates a confession if it 'supports the essential facts admitted sufficiently to justify a jury inference of their truth,' the facts admitted 'plus the other evidence besides the admission must, of course, be sufficient to find guilt beyond a reasonable doubt.'" *Abu Ali*, 528 F.3d at 235 (quoting *Opper*, 348 U.S. at 93).  Ultimately, the Court concluded:

> To be sure, the independent evidence does not *prove* Abu Ali's guilt of any crime, but this is not necessary.  In his own statements, Abu Ali confessed to committing each of the crimes.  Extrinsic proof is sufficient which merely fortifies the truth of the confessions, without independently establishing the crime charged.  The independent evidence offered by the government did just that.

*Abu Ali*, 528 F.3d at 237.

The Fourth Circuit also addressed the corroboration rule in *United States v. Stephens*, 482 F.3d 669 (4th Cir. 2007), a case decided before *Abu Ali* and upon which the majority in *Rodriguez-Soriano* heavily relied.  In *Stephens*, a Roanoke police officer heard a gunshot and headed towards the direction of the gunfire, ultimately coming into contact with the defendant.  After taking the defendant into custody, the officer found a revolver lying near where the officer had first observed the defendant.  During an interview after his arrest, the defendant said that he had fired the shot, because his drug supplier had threatened to kill him after the defendant had failed to pay for drugs that the supplier had fronted him.  *Stephens*, 482 F.3d at 671.  During the trial, the defendant retracted his statement, saying he had lied after his arrest.  To corroborate the defendant's confession, the Government introduced the testimony of an agent who said that he knew of the drug supplier that the defendant had identified in his confession.  The jury convicted the defendant of drug trafficking and using a firearm during a drug trafficking offense.  On

appeal, the Fourth Circuit reversed, determining that the Government had failed to introduce sufficient evidence corroborating the defendant's participation in the drug trade. *Id.* at 673. The Fourth Circuit focused on the "lack of follow-up investigations which might have served to fortify the truth of his confessions." *Id.*

These cases make clear that, before the Fourth Circuit's decision in *Rodriguez-Soriano*, the corroboration rule focused on the trustworthiness of the defendant's statement — whether sufficient independent evidence existed to corroborate the defendant's confession. This explains why the Government urges application of the trustworthiness analysis in its papers. However, in the view of the undersigned, the Fourth Circuit departed from this well-traveled path when it revisited the corroboration rule in *Rodriguez-Soriano*. And that departure compels a different outcome here than would have occurred before the decision.

3.    The Fourth Circuit's Decision in *Rodriguez-Soriano*

The facts in *Rodriguez-Soriano* are strikingly similar to the current case. The defendant purchased two firearms from a licensed firearms dealer in Northern Virginia. At the time of the purchase, the defendant indicated on the ATF Form 4473 that he was the actual buyer. Over a year later, one of the firearms was recovered in Washington, D.C., during a homicide investigation. ATF agents then interviewed the defendant twice about the firearms. As happened here, the defendant initially lied before he admitted buying the guns for an acquaintance at their request. The Government charged the defendant with making a false statement to a licensed firearms dealer pertaining to the purchase of the firearms. 931 F.3d at 284-85.

During the trial, the Government introduced into evidence the ATF Form for the purchase, the defendant's confession, and the testimony of an ATF agent about the recovery of

the firearm.  The Government did not introduce the gun into evidence and, importantly, the ATF

agent's testimony was not offered for the truth of the matter asserted, but instead was admitted

solely to explain why the investigation into the firearms purchase began and not to establish that

the defendant no longer had possession of the firearm.  *Id.* at 286, 290.  A divided panel found

this evidence insufficient to corroborate the defendant's confession and vacated the defendant's

conviction.  *Id.* at 290-91.

In applying the corroboration rule, the Court explained that the "corroborative evidence

does not have to prove the offense beyond a reasonable doubt, or even by a preponderance.  But

there must be substantial independent that the offense has been committed in the *first instance*,

and that the evidence as a whole proves beyond a reasonable doubt that the defendant is guilty.

Only after a defendant's admissions have been corroborated by sufficient independent evidence

may the government 'prove the offense through the statement of the accused.'"  *Id.* at 288

(quoting *Abu Ali*, 931 F.3d at 235) (emphasis added and internal citations omitted).

Against this framework, the Court found the Government's corroborating evidence

insufficient, finding that the Government had "failed to meet its burden to prove that Rodriguez-

Soriano knowingly made a false statement to firearms dealer as to the identity of the actual buyer

of the firearms."  *Id.* at 288.  In doing so, the Court addressed the four pieces of evidence that the

Government cited as corroboration:  (1) the guns that the defendant had purchased were no

longer in his possession; (2) the defendant initially lied about his possession of the firearms; (3)

his statement contained inconsistencies about the location of the firearms; and (4) the defendant

reaffirmed his confession in a subsequent interview.  *Id.* at 289.

The Court found defendant's initial lies and the inconsistencies as failing to establish that

the defendant had lied about being the actual buyer at the time of the purchase.  *Id.* at 290.  The

Court also gave little weight to the subsequent statements, determining that "the Government cannot rely on a second uncorroborated confession as independent evidence corroborating the initial one, particularly where the second one does nothing to 'fortify the truth of the confession' by offering further corroboration that a crime was committed." *Id.* at 290 (quoting *Stephens*, 482 F.3d at 672-73).

The key point, particularly as applied to the current case, was that the firearms were no longer in the defendant's possession. On this point, the Court found that the only evidence came from the defendant's statement since the ATF agent's testimony about the recovery was admitted solely to explain the origin of the investigation. *Id.* at 290. Moreover, and importantly, the Court explained: "That Rodriguez-Soriano no longer possessed the firearms at the time of the interview did not itself indicate that he knowingly misrepresented he was the actual buyer." *Id.* The Court concluded, therefore, that "where the only evidence of the *corpus delicti* is an uncorroborated confession, the evidence is insufficient as a matter of law." *Id.*

Judge Richardson wrote a strongly worded dissent that retraced the history of the corroboration rule and concluded that the majority opinion had rewritten the rule, "reviving and expanding the old *corpus delicti* doctrine by demanding evidentiary proof, independent of his many admissions, that Rodriguez-Soriano violated each element of the crime." *Id.* at 291. In his view, "[t]he independent evidence need only reinforce the credibility of the defendant's statement, not independently establish each element of the offense." *Id.* at 294. The dissent then concluded:

> A defendant may not be convicted based solely on an uncorroborated confession. But the law does not require a prosecutor convict a defendant before a jury may hear his confession. Instead, the law takes a middle ground between these two extremes, merely requiring evidence that tends to establish the trustworthiness of the confession. This rule helps to ensure that defendants are not convicted based on false confession, while also not hampering the search for the truth with an unreasonable evidentiary burden.

*Id.* at 295.

With all due respect to the majority, and recognizing that the undersigned sits on an inferior court, the undersigned agrees with Judge Richardson's view of the corroboration rule based on the long-standing caselaw cited above. By requiring independent proof in the "first instance," the majority vastly expands the corroboration rule and takes a step towards resurrecting the *corpus delicti* doctrine explicitly rejected by the Supreme Court in *Opper*.

The consequence of that different interpretation of the law is significant. By viewing the evidence through the lens of the statement, as opposed to viewing it independently in the *first instance* before considering the statement, the evidence takes on a different meaning. In other words, the order of review of the evidence impacts the consequence of the non-statement evidence. The majority opinion says that the non-statement evidence must be viewed in the "first instance" and stand on its own merits, as the *corpus delicti* doctrine once commanded. In contrast, *Opper* and its progeny begin with the statements and ask whether sufficient facts exist to corroborate the essential facts of the statement, thereby rendering it reliable. And a reliable statement results in a trustworthy verdict, which remains the true goal. *Smith*, 348 U.S. at 156 (the corroboration rule serves to prevent "errors in convictions based on untrue confessions alone") (quoting *Warszower v. United States*, 312 U.S. 342, 347 (1941)); *Rodriguez-Soriano*, 931 F.3d at 287-88 ("courts require corroboration to prevent confessions to crimes never committed and convictions based upon untrue confessions alone") (internal quotation marks and citations omitted). And it bears remembering that "since [the] corroboration rule infringes on the province of the primary finder of facts, its application should be scrutinized lest the restrictions it imposes surpass the dangers which gave rise to them." 931 F.3d at 288 (internal quotation marks and citations omitted).

The question then becomes how the Court should proceed here when it respectfully believes that the majority opinion in *Rodriguez-Soriano* expands the corroboration rule well beyond what prior precedent required of the Government. If the Court finds that the panel decision in *Rodriguez-Soriano* irreconcilably conflicts with long-standing Supreme Court precedent and the Fourth Circuit's own holding in *Abu Ali*, then it must follow *Abu Ali*, not *Rodriguez-Soriano*, in adherence to the irreconcilable conflict doctrine as set forth in *McMellon v. United States*, 387 F.3d 329 (4th Cir. 2004) (*en banc*). This doctrine provides that "[w]hen published panel opinions are in direct conflict on a given issue, the earliest opinion controls, unless the prior opinion has been overruled by an intervening opinion from this court sitting *en banc* or the Supreme Court." 387 F.3d at 333.[9] However, for the irreconcilable conflict doctrine to apply, "the two panel decisions must be irreconcilable." *Plunkett v. Potter*, 751 F. Supp. 2d 807, 812 (D. Md. 2010).

Here, the Court will not find an irreconcilable conflict amongst the panel decisions, although a plausible argument surely exists that *Rodriguez-Soriano* conflicts with *Abu Ali*. Instead, the Court will apply *Rodriguez-Soriano* as an expansion of the corroboration rule, rather than an attempt to overrule prior precedent. Indeed, *Rodriguez-Soriano* quotes extensively from *Abu Ali* for support but does not make an effort to explicitly overrule any legal principles therein. Moreover, in many instances the corroborating evidence of a confession will satisfy both *Abu Ali* and *Rodriguez-Soriano*, as the Government argues here. Likewise, in many instances the evidence will fail to satisfy either, as Defendant argues here. This case falls in between, as the Court will discuss below. Despite the Court's belief that the majority in *Rodriguez-Soriano*

---

[9]     This principle constitutes "black-letter Circuit law" in the Fourth Circuit. *United States v. Gibbs*, 905 F.3d 768, 770 (4th Cir. 2018) (Wynn, J., voting to vacate panel opinion).

expanded the corroboration rule to a point that approaches an irreconcilable conflict with *Opper* and *Abu Ali*, it did not quite reach that point. Accordingly, it remains binding precedent.

Three additional reasons counsel against applying the irreconcilable conflict doctrine. First, the Government did not seek rehearing *en banc* in *Rodriguez-Soriano*, apparently determining that the majority opinion did not represent a conflict with pre-existing precedent.[10] Second, and importantly, when asked whether the Court should apply the irreconcilable conflict doctrine here, the Government responded: "Although the United States disagrees with the ruling in *Rodriguez-Soriano* and believes that it does not represent the best reading of *Opper*, the United States does not contend that *Rodriguez-Soriano* fails to qualify as precedent . . . . There is no need for this Court to apply a rule of irreconcilable conflict." (ECF No. 134 at 16.) Finally, the Court believes that the Court of Appeals holds a better position to address any conflict, not a district court. And the district courts addressing the irreconcilable conflict doctrine have similarly deferred to the Court of Appeals. *See, e.g., Jones v. Tyson Foods, Inc.*, 378 F. Supp. 2d 705, 709 (E.D. Va. 2004) (recognizing the plaintiff's irreconcilable conflict argument regarding two Fourth Circuit decisions but nonetheless deciding to follow the later opinion as binding precedent); *cf. United States v. J.J.P.*, 2020 WL 1955571, at *4 (D. Md. Apr. 23, 2020) (noting that it "is not the role of [a district court]" to "upend[] . . . Fourth Circuit precedent," merely because a litigant presents a compelling legal argument).

For these reasons, the Court will apply the majority opinion in *Rodriguez-Soriano* here. However, should the Government elect to appeal, the Court wishes to make clear for the record that, in the absence of the majority opinion in *Rodriguez-Soriano*, the Court would have applied

---

[10]     When asked why the Government did not seek rehearing *en banc* in *Rodriguez-Soriano*, the Government asserted privilege and refused to answer the Court's question. (ECF No. 134 at 17.)

the corroboration rule consistent with Judge Richardson's view and would have found Defendant's statement to the ATF agents to be trustworthy. Here, unlike the statements at issue in *Opper, Smith* and *Wong Sun*, the statement was recorded, except for the initial twenty seconds when the agents first entered Defendant's apartment. (Tr. 218:4-16.) Consequently, the jury could see the statement for itself and make its assessment of the voluntariness of Defendant's statement and its credibility. In doing so, it was also able to weigh the impact of Defendant's mental health issues on the statement, because it heard extensive evidence about Defendant's mental health from experts from both sides. (Dr. Lynch's testimony, Tr. 240-95; Dr. Nelson's testimony, Tr. 332-70.) Because the only evidence of Defendant's guilt came from his statement, the jury necessarily found his statement voluntary and credible. And had this case been a bench trial, the Court would have reached the same verdict for the same reason, with the exception of Count Five for the reasons discussed below.

A review of Defendant's statement (Gov't Ex. 5A) clearly reveals a non-coercive statement with Agent Liptak raising his voice only slightly on one occasion when he told Defendant to stop lying. (Tr. 219:10-16.) Moreover, as in *Wong Sun*, Defendant filed no motion to suppress the statement, nor made any other constitutional challenge to the admissibility of the statement. *Wong Sun*, 371 U.S. at 491 (noting that the defendant "has never suggested any impropriety in the interrogation itself which would require the exclusion of this statement"). And the existence of the military discount that Defendant cited offers corroboration of his statement.[11] Similarly, Defendant's lack of possession of the firearms so soon after the

---

[11]    The Court finds the Government's disavowing of the existence of the military discount baffling. The evidence clearly showed that a military discount was available at both the Town Police Supply Company and the Bob Moates Sports Shop, and was likely applied to at least one of the purchases. (Tr. 138:1-9, 169:16-170:20, 176:6-18.)

purchases corroborates his admission that he purchased the firearms for another person. In short, having been able to witness the statement, hear the mental health evidence, and consider the other evidence presented, the jury was in the best position to assess Defendant's statement, and its verdict necessarily revealed that it found Defendant's statement credible and reliable. *See Moye*, 454 F.3d at 394 (the jury carries the responsibility to interpret the evidence).

### 4.    Applying *Rodriguez-Soriano* to the case at bar

Although the Court finds Defendant's confession to be trustworthy, his convictions cannot meet the standard set by the majority opinion in *Rodriguez-Soriano*. As in *Rodriguez-Soriano*, the Government here bears the burden of establishing in the first instance by substantial independent evidence that Defendant "falsely stated to the licensed firearms dealer that he was purchasing the firearms for himself with the knowledge that the statement was false." *Rodriguez-Soriano*, 931 F.3d at 287. As discussed above, that includes establishing that Defendant did not purchase the firearms as a gift. "The corroborative evidence does not have to prove the offense beyond a reasonable doubt, or even by a preponderance. But there must be substantial independent evidence that the offense has been committed in the *first instance*, and that the evidence as a whole proves beyond a reasonable doubt that the defendant is guilty." *Id.* at 288 (emphasis added).

Initially, the Court notes that the issue about the corroboration rule does not apply to Count Five — the last purchase from Green Tops Sporting Goods Store on September 13, 2015, because the agents forgot to question Defendant about this purchase since they neglected to bring up the ATF Form 4473 for this sale with Defendant and Defendant did not bring it up. (Tr. 218:17-219:3.) Consequently, there is no statement to corroborate. This sale will be addressed in more detail below.

As to the other purchases, absent Defendant's statement, no evidence exists in the record about what happened to the firearms after the purchases until they were recovered. The Government acknowledges that no non-statement evidence exists in the record about the identity of the actual buyer, nor the source of the funds for the purchases. (ECF No. 137 at 4-7.) Indeed, the Government concedes that had Defendant's statement not been admitted during its case-in-chief, the Government would not have survived a Motion for a Judgment of Acquittal under Fed. R. Crim. P. 29(a). (ECF No. 137 at 7.) Importantly, the only evidence in the record eliminating the purchases as a gift or suggesting the identity of the actual buyer stem from Defendant's statement that he utilized Pointer's money to buy the firearms for Pointer and French, and no evidence exists to corroborate this point.

The Government points to several facts as circumstantial evidence of Defendant's guilt, but none hold sway here. First, the Government describes the purchase of six firearms during four transactions as "suspicious." (ECF No. 137 at 5.) Yet, the Government concedes that all of the purchases were facially valid and nothing prohibited Defendant from purchasing this number of firearms within this time period. (ECF No. 134 at 22.) Moreover, even making the inference that these facially legal purchases provoke suspicion, "suspicious" lawful conduct does not rise to the level of "substantial independent evidence."

The Government next points to the fact that, during the first purchase at the Town Police Supply Company, Presnell asked Defendant if he had purchased another firearm within the last five days. (Gov't Ex. 1B; Tr. 133:23-134:8.) Defendant did not make another purchase at Town Police Supply Company, which the Government attributes to the asking of this question. Yet, the next two purchases occurred at the Bob Moates Sport Shop, which was half the distance from Defendant's residence as the Town Police Supply. (Tr. 209:14-21.) Ironically, the Government

also questions why Defendant would drive thirty minutes to Ashland to make his final purchase, but ignores the military discount that Defendant received for doing so. (Tr. 199:2-12.)  In sum, the above circumstantial evidence that the Government points to and the inferences derived therefrom provide no evidence of the identity of the actual purchaser or that Defendant did not purchase the firearms as gifts.

The one fact that distinguishes this case from *Rodriguez-Soriano* is Stipulation 2 in which the parties agreed that the firearms at issue "were recovered by law enforcement officers from another person unrelated to the defendant in another state" on the dates set forth in the stipulation. (Stipulation No. 2 (ECF No. 97); Tr. 203.)  The Government asserts that this lack of possession of the firearms so soon after the purchases supports an inference of guilt. (ECF Nos. 134 at 13; 137 at 6.).  Yet, the Fourth Circuit in *Rodriguez-Soriano* directly rejected such an inference. *Rodriguez-Soriano*, 931 F.3d at 290 ("That Rodriguez-Soriano no longer possessed the firearms at the time of the interview did not itself indicate that he knowingly misrepresented he was the actual buyer.").  However, the impact of the stipulation proves a good example of how a fact can carry different import when viewed in a vacuum absent the statement as the majority opinion in *Rodriguez-Soriano* commands, instead of utilizing it to assess the trustworthiness of a confession.

Moreover, the value of the stipulation is minimal given that the issue is what Defendant knew at the time of each transaction. *See Ortiz*, 318 F.3d at 1038 ("a straw transaction occurred here because Ortiz *at the time of completing Form 4473* had no intention of keeping the firearms or giving them as a gift") (emphasis in original).  Giving all reasonable inferences to the Government as the Court must at this stage, the recoveries show at best that Defendant would have known that he no longer possessed the firearms as of the date of the recovery.  Notably, the

first recovery was not until August 24, 2015 — three days after the second purchase.
Consequently, the stipulation offered no evidentiary support as to Defendant's knowledge for
Counts Two and Three, which relate to the sales before the recovery. The next recovery did not
occur until September 10, 2015 — two days after the third purchase — and involved the
purchase on August 19, 2015, and one of the firearms purchased on September 8, 2015. The last
recovery did not occur until roughly five months later and involved the transaction on September
13, 2015 for which Defendant made no statements.

Two additional points merit discussion. First, even though the Government relies solely
on Defendant's statement for his conviction and repeatedly describes his statement as
trustworthy after his initial lies, the Government undermines the reliability of the statement by
attacking the substance of his statement in two ways. First, as previously mentioned, the
Government told the jury in its opening statement that "records from Bob Moates and Town
Police were going to show . . . that he didn't receive any [military] discount." (Tr. 115:8-10.)
Yet, Defendant said in his confession that Pointer and French pressured him to purchase the
firearms to take advantage of his military discount. (Statement Tr. 16:23-25, 23:13-19.)
Additionally, Defendant stated in his confession that Pointer and French told him that they
intended to give the firearms as Christmas gifts. (Statement Tr. 29:12-14.) Yet, the Government
attacks this part of Defendant's confession, describing it as "self-serving." (Gov't Resp. at 16
n.8.) The Court finds it troubling that the Government would attack the credibility of the only
piece of evidence that incriminates Defendant, while concomitantly arguing that Defendant's
confession was trustworthy.

Second, as in *Rodriguez-Soriano*, additional evidence exists that the Government did not
pursue. *Rodriguez-Soriano*, 931 F.3d at 290 ("Here, it appears that the prosecutor knew the

identities of potential corroborating witnesses, yet we can only speculate as to why evidence corroborating Rodriguez-Soriano's alleged offense was not presented at his trial."). First, the Government could have simply introduced Pointer's felony conviction that would have established that he was prohibited from possessing a firearm, which could have led to an inference that Pointer used Defendant as a straw purchaser, instead of Defendant simply buying the firearms for Pointer as a gift. But the Government elected not to introduce Pointer's criminal record. (Feb. 14, 2020 Hr'g Tr. 8:25-9:2.) Likewise, the Government elected not to use the tools at its disposal to elicit testimony from Pointer at trial. The Government stated that Pointer was convicted in the New York state courts and his appeal remains pending, so he retains his Fifth Amendment rights. (ECF No. 134 at 28-29.) However, following Pointer's trial, the Government could have compelled his testimony by conferring use immunity on him under 18 U.S.C. § 6002, thereby stripping him of his Fifth Amendment rights. But the Government elected not to. (June 12, 2020 Hr'g Tr. 31:8-32:4.) Moreover, according to Defendant's statement, Monica French accompanied him to the purchases at the Town Police Supply and the Bob Moates Sport Shop. (Statement Tr. 10:3.) Yet, the Government did not interview her. (June 12, 2020 Hr'g Tr. 31:25; ECF No. 134 at 29.)[12] In other words, these issues arose due to the Government's choices during the investigation and litigation of this case.

In finding that the Government failed to introduce sufficient evidence to meet the demands of the majority opinion in *Rodriguez-Soriano*, the Court has particularly focused on the lack of evidence establishing that Defendant did not purchase the firearms as gifts or the identity

---

[12]     When asked about Monica French ("French") during the hearing, the Government responded that it attempted to interview French but was unsuccessful. The Government invoked work-product privilege rather than explaining the reasons for its lack of success. (June 12, 2020 Hr'g Tr. 30:19-31:5.)

of the actual purchaser. The only evidence in the record on this point comes from Defendant's statement, during which Defendant told the ATF agents that Pointer gave Defendant the funds for the purchases and pressured him to buy the guns for Pointer and French, so that they could give the firearms as Christmas gifts. As discussed above, to establish that Defendant was not the actual buyer, the Government needed to prove beyond a reasonable doubt that Defendant did not purchase the firearms for Pointer and French as gifts. Its proof on this point in particular fails to meet the demands of *Rodriguez-Soriano*, thereby mandating the vacating of Defendant's convictions.

### D. The Sufficiency of the Evidence for Count Five

Beyond the violation of the corroboration rule, Count Five must also be vacated due to an insufficiency of the evidence.[13] As noted above, the agents forgot to question Defendant about the purchase from the Green Top Sporting Goods Store on September 13, 2015 (the purchase at issue in Count Five), because they "skipped right over" the ATF Form 4473 for that purchase during questioning and Defendant did not bring it up. (Tr. 218:17-219:3.) Consequently, the

---

[13]     The Government objects in its papers about the Court *sua sponte* raising this issue, citing to *United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020). (ECF No. 143 at 5.) However, *Sineneng-Smith* is inapposite here and the Government's complaints ring hollow. The Supreme Court in *Sineneng-Smith* chided the Ninth Circuit for appointing three *amici* and then inviting them to advance completely different issues framed by the panel that the appellant never raised. 140 S.Ct. at 1578. In doing so, the Court determined that the Ninth Circuit had exceeded the party presentation role. *Id.* at 1579. Yet, the Court also made clear that the "party presentation principle is supple, not ironclad. There are no doubt circumstances in which a modest initiating role for a court is appropriate." *Id.* As the Court reinforced, "a court is not hidebound by the precise arguments of counsel . . . ." *Id.* at 1581. And that is what occurred here. Defendant has raised a challenge to the sufficiency of the evidence and, in reviewing the parties' pleadings and the record, the Court realized that Count Five suffered from a specific deficiency different than the other counts and directed the parties to address the issue. Unlike the Ninth Circuit in *Sineneng-Smith*, the Court did not sideline the parties in favor of soliciting arguments from strangers to the litigation. Rather, the Court asked the parties — and only the parties — to address the issues that it felt needed addressing.

only evidence in the record about this purchase consists of the ATF Form 4473 reflecting the purchase and the stipulation that it was recovered by law enforcement officers on February 10, 2016 — roughly five months after this sale as well as the purchases and recoveries of the other firearms at issue — from another person unrelated to Defendant in another state. (Stipulation No. 2 (ECF No. 97); Tr. 204:6-7.)  The Government has offered no evidence at all about anyone other than Defendant being the actual buyer, whether the firearm was purchased as a gift, who supplied the funds for the purchase and what happened with the firearm after the sale until its recovery.

The Government argues that, because this was the sixth firearm purchased by Defendant, the purchase must be viewed in the context of the other purchases and that reasonable inferences can be drawn to support the inference that Defendant also purchased this firearm for Pointer as well.  (ECF No. 143 at 5-7.)  Yet, in another of its filings, the Government concedes that it could not meet its burden of proof as to any of the offenses without the introduction of Defendant's statement.  (ECF No. 137 at 7.)  Since Defendant's statement makes no mention of the purchase at issue in Count Five, clearly insufficient evidence exists to support the conviction and it must be vacated.

### IV.  Conclusion

For the reasons set forth above, the Court rejects Defendant's ambiguity challenge to ATF Form 4473.  However, the Court finds that the Government failed to introduce sufficient evidence to meet the demands of the majority opinion in *Rodriguez-Soriano*, thereby mandating

the vacating of his convictions.  The Court also finds that Defendant's conviction in Count Five must be vacated based on the insufficiency of the evidence.[14]

The Clerk is directed to file this Opinion electronically and provide a copy to all counsel of record.

It is so ORDERED.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Dated:  June 16, 2020

_____

[14]     Following the hearing on June 12, 2020, the Court entered an Order (ECF No. 145) granting Defendant's Motion.  This Memorandum Opinion provides the basis for that Order.